**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

---

CINDY CORCORAN,

          Plaintiff,

    v.

G&E REAL ESTATE
MANAGEMENT SERVICES, INC.,

          Defendant.

---

Civil Action No.
3:20-cv-18 (CSH)

**SEPTEMBER 4, 2020**

---

## RULING ON DEFENDANT'S MOTION TO DISMISS

**HAIGHT, Senior District Judge:**

Plaintiff Cindy Corcoran ("Plaintiff" or "Corcoran") originally instituted this action against G&E Real Estate Management Services, Inc. ("Defendant" or "G&E") in Superior Court of the State of Connecticut. Doc. 1. Plaintiff brought various claims under Connecticut law related to her termination from G&E, including that: (1) G&E deprived Plaintiff of her rights based on her sexual orientation; (2) that she was discharged from employment based on gender identity or expression; (3) that she was harassed based on her sexual orientation; (4) negligent infliction of emotional distress; (5) negligent misrepresentation; and (6) breach of duty of good faith and fair dealing. Doc. 1-1.

G&E timely removed the lawsuit to this Court on the basis of diversity jurisdiction. Doc. 1 ¶ 7. Thereafter, Corcoran filed an Amended Complaint. Doc. 19. G&E then filed a motion to dismiss, and Corcoran filed an opposition brief. Docs. 29, 36. However, before the Court ruled on G&E's motion, the Parties conferred and agreed that Corcoran would file a Second Amended Complaint, in which she would remove her claims related to her sexual orientation, but would add

1

a common law wrongful termination claim. Doc. 39, at 1–2. The Second Amended Complaint was then filed on the Docket. Doc. 43 ("SAC").

Pending before this Court is G&E's motion to dismiss Plaintiff's SAC. Doc. 44 ("Def.'s Mot."); Doc. 44-1 ("Def.'s Mem."). Plaintiff filed objections to the motion. Doc. 45 ("Pl.'s Mem.). G&E replied. Doc. 46 (Def.'s Reply"). This Ruling resolves Defendant's motion.

## I.   BACKGROUND

The facts herein are taken from the allegations in Corcoran's SAC, which are accepted as true only for purposes of this Ruling.[1]

On July 23, 2012, Corcoran began working as a senior chief engineer for G&E, a commercial real estate advisory firm. SAC ¶ 8–9. Corcoran served in a supervisory capacity at G&E, and managed twenty-two employees. *Id.* ¶ 13. Beginning in 2015, Corcoran was primarily assigned to work with G&E's client, Aetna, at their offices located in Hartford, Connecticut. *Id.* ¶ 11.

### A.   Corcoran's Discipline of G&E Employees

During Corcoran's employment, some of the employees that she managed had performance issues that Corcoran, as their supervisor, needed to address. *Id.* ¶ 18. For example, one employee on Corcoran's team, Kurt, was found napping in a room without lights on by Corcoran's direct supervisor's superior, who directed Corcoran's supervisor to have Corcoran address it. *Id.* ¶ 22. At the same time, the senior G&E employee remarked to Corcoran's boss that Kurt "looks like a slob" and suggested that Corcoran should address his workplace appearance when she spoke to him about sleeping in the office. *Id.* ¶ 23. Following that directive, Corcoran had a few discussions with

---

[1]  The Court has reviewed all of the allegations in Corcoran's SAC. However, the Court omits allegations that are related to her now-withdrawn sexual orientation discrimination claims. Doc. 39, at 1–2. Familiarity with all allegations in the SAC is assumed.

Kurt about his appearance; his not being allowed to sleep during work hours; and G&E's expectation concerning how he should generally carry himself around the workplace. *Id.* ¶ 24.

Corcoran also had a meeting with her entire team to discuss general workplace behavior, expectations, and the importance of appearing clean and neat in the office. *Id.* ¶ 25. Kurt felt like he was "targeted" at the meeting and demanded a formal apology from Corcoran. *Id.* ¶ 26. He then filed a complaint against Corcoran through G&E's human resources ("HR") hotline in which he accused Corcoran of bullying him and threatening his job. *Id.* ¶ 27. Meanwhile, after the conclusion of these incidents, Corcoran started to notice that her supervisor was treating her differently, and his behavior toward her was unusual based on how he had normally interacted with her. *Id.* ¶ 28.

Corcoran then faced workplace issues with another employee that she supervised, Jameel. *Id.* ¶ 30. These issues were primarily related to insubordination and his general demeanor and presentation. *Id.* ¶ 30. Jameel's direct supervisor, Tony, reported to Corcoran that when Tony provided Jameel with instruction regarding work assignments, Jameel would find reasons to stop working, call Tony back over to him, and ask Tony questions that were unrelated to the task at hand. *Id.* ¶ 31. Corcoran documented Jameel's issues. *Id.* ¶ 32. She also met with Jameel one on one, and again with one of Corcoran's leads, to discuss Jameel's issues and to offer assistance. *Id.*

After seeing no improvement, Corcoran met with HR to discuss her notes about Jameel's performance. *Id.* ¶ 33. Jameel was also given the opportunity to meet with HR to give his version of events. *Id.* ¶ 34. Around the same time, he filed a complaint stating that he felt "harassed" by Corcoran. *Id.* ¶ 35. After the complaint was filed, Corcoran was told that Jameel is in a protected class, and that Corcoran "must back off regardless of whether he is right or wrong." *Id.* ¶ 36. Corcoran felt that she was no longer allowed to correct his behavior as his manager. *Id.* ¶ 37.

3

**B.    G&E's Internal Investigation of Corcoran**

Sometime thereafter, Corcoran learned that from May 7, 2018, through June 6, 2018, G&E conducted an internal investigation regarding Corcoran without her knowledge. *Id.* ¶ 39. On June 6, 2018, Corcoran received an email invitation for a conference call with an employee in G&E's corporate office. *Id.* ¶ 40. Shortly after the call, Corcoran received another invitation for a meeting with her boss and a human resources representative. *Id.* ¶ 41. During this meeting, Corcoran was told that there had been an investigation based on complaints that her team members made about her. *Id.* ¶ 42. At the meeting, Corcoran was presented with a performance review plan for various alleged violations of conduct, including threatening to fire staff for underperformance, commenting on staff's personal appearance, and creating an uncomfortable environment for the team. *Id.* ¶ 44. Corcoran disagreed with the entirety of the performance review plan. *Id.* ¶ 45.

On June 12, 2018, Corcoran participated in a follow up meeting to enact the performance review plan. *Id.* ¶ 47. The plan was scheduled to end on August 6, 2018, and Corcoran was scheduled to have bi-weekly meetings to monitor her progress. *Id.* ¶ 48.

**C.    Prior Conviction, Background Check, and Termination**

In 2007, Corcoran was convicted of a felony. *Id.* ¶ 49. In her original employment application, Corcoran did not disclose the conviction. *Id.* ¶ 50. However, G&E and Aetna were aware of the conviction during Corcoran's employment, and Corcoran had continued to work for G&E at Aetna for many years. *Id.* ¶ 51–53. Corcoran was advised that Aetna did not want an additional background check performed on her. *Id.* ¶ 54.

Following the complaints from her subordinates and the investigation, G&E demanded that Corcoran agree to a new background check or lose her job. *Id.* ¶ 55. Corcoran consented, and believes that the results of the background check reflected her felony conviction. *Id.* ¶¶ 56–57.

Thereafter, on July 10, 2018, Corcoran received a letter stating that her employment with G&E was being involuntarily terminated effective immediately. *Id.* ¶ 58. Corcoran's last day of employment was July 10, 2018. *Id.* ¶ 59. At that time, Corcoran was told that she "no longer meets the criteria for employment." *Id.* ¶ 60. Corcoran's salary was approximately $104,000.00 per year. *Id.* ¶ 61. Her professional reputation and personal stature within G&E's structure and outside have been damaged by the termination. *Id.* ¶ 62.

## II.    STANDARD OF REVIEW

On a motion to dismiss, "the issue is 'whether the claimant is entitled to offer evidence to support the claims.'" *Patane v. Clark*, 508 F.3d 106, 111 (2d Cir. 2007) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1984)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard creates a "two-pronged approach" which is based on "[t]wo working principles." *Iqbal*, 556 U.S. at 678–79.

First, all factual allegations in the complaint must be accepted as true; and all reasonable inferences must be drawn in the favor of the non-moving party. *See id.*; *see also Gorman v. Consolidated Edison Corp.*, 488 F.3d 586, 591–92 (2d Cir. 2007) (citation omitted). The presumption of truth does not extend, however, to "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

Second, "a complaint that states a plausible claim for relief" will survive a motion to dismiss and "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679) (internal quotation marks omitted). "Dismissal under Federal Rule of Civil Procedure 12(b)(6) is appropriate when it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Associated Fin. Corp. v. Kleckner*, 480 F. App'x 89, 90 (2d Cir. 2012) (citation and internal quotations marks omitted).

## III.   DISCUSSION

Corcoran claims against G&E are the following: (1) negligent misrepresentation; (2) negligent infliction of emotional distress; (3) wrongful termination; and (4) breach of duty of good faith and fair dealing.  G&E moves to dismiss all claims.  The Court will address the claims in order.

### A.   Negligent Misrepresentation

Under Connecticut law, "an action for negligent misrepresentation requires the plaintiff to establish 1) that the defendant made a misrepresentation of fact; 2) that the defendant knew or should have known was false; and 3) that the plaintiff reasonably relied on the misrepresentation, and 4) suffered pecuniary harm as a result." *Nazami v. Patrons Mut. Ins. Co.*, 280 Conn. 619, 262 (2006) (citing *Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 73 (2005)).

Corcoran alleges the following in connection with her negligent misrepresentation claim: G&E advised Corcoran that it was aware of the felony conviction and continued to employ her without restriction; she was further advised that a background check was necessary for her continued employment at G&E but its result would not impact her employment; that she relied on that statement

which G&E knew or should have known was false; and she suffered pecuniary loss as a result of her reliance on that misrepresentation. SAC ¶¶ 64–67.

G&E primarily challenges the third prong of Corcoran's negligent misrepresentation claim. G&E asserts that Corcoran did not sufficiently allege she reasonably relied on any statement by G&E. Def.'s Mem. at 4. According to G&E, Plaintiff made only a conclusory allegation in her SAC regarding her reliance on G&E's statement, which is deficient as a matter of law. *Id.* G&E also claims that Corcoran in her opposition Brief did not "even attempt to explain how Plaintiff relied on the alleged misrepresentation." Def.'s Reply at 2. The Court agrees.

Plaintiff devotes one sentence to the reliance prong of her misrepresentation claim in the SAC: "Corcoran relied on that statement which G&E knew or should have known was false." SAC ¶ 66. This is insufficient to state a claim of negligent misrepresentation because Plaintiff does not allege—beyond this single and conclusory statement—in which ways, if any, Corcoran relied on G&E's statement. Corcoran's allegation is a mere "[t]hreadbare recital" of the reliance element. *Iqbal*, 556 U.S. at 678. The SAC—and Corcoran's Brief, for that matter—provide nothing more to state a "plausible claim for relief." *Harris*, 572 F.3d at 72 (quoting *Iqbal*, 556 U.S. at 678); *cf. Umbach v. Carrington Inv. Partners (US), LP*, No. 08 Civ. 484 (EBB), 2013 WL 12288988, at *10 (D. Conn. July 19, 2013) (denying motion to amend because plaintiff's negligent misrepresentation claim would not withstand a motion to dismiss under Rule 12(b)(6): he alleged "naked assertions" and "legal conclusions" regarding the misrepresentation element and only "bald assertions" regarding the causation element which were "nothing more than the kind of conclusory and formulaic recitation of the elements" of wrongdoing that, under *Twombly* and *Iqbal*, is not entitled to be assumed true for

purposes of Rule 12(b)" (citation and internal quotation marks omitted)).[2]

Even if Corcoran relied on G&E's statement, G&E argues in the alternative that Corcoran's reliance was not reasonable.  Def.'s Mem. at 6.  According to G&E, as an at-will employee, Corcoran's "employment could end at any time for any reason."  *Id.*  Therefore, G&E contends, any reliance would have been misplaced.  *See id.*

The Court is less persuaded by this argument.  It is true, as G&E claims, that employers generally possess the "unfettered discretion to end the employment relationship at any time" when an individual is employed at will.  *Desrosiers v. Diageo N. Am., Inc.*, 137 Conn. App. 446, 460 (2012) (citation and internal quotation marks omitted), *aff'd in part, rev'd in part on other grounds*, 314 Conn. 773 (2014).  Thus, an employee's acknowledgment of his or her at will status can defeat a negligent misrepresentation claim because the employee could not reasonably believe that his or her employment would continue for any particular time frame.  *See, e.g.*, *Lowe v. AmeriGas, Inc.*, 208 F.3d 203 (2d Cir. 2000) ("Because appellant signed a written acknowledgment that he was to be an employee-at-will and that also referenced the company's guide stating that no employee could modify those employment-at-will terms, no reasonable jury could find that appellant justifiably relied on Sheffield's alleged misrepresentations.").

---

[2]  One way that Corcoran could have alleged that she relied on G&E's misrepresentation is by alleging that she refrained from seeking other employment opportunities.  *See, e.g.*, *Goncalves v. Superior Plating Co.*, No. CV085015711, 2010 WL 3964659, at *7 (Conn. Super. Ct. Sept. 9, 2010) (plaintiff sufficiently alleged reliance prong of negligent misrepresentation claim because defendant's employee "made misrepresentations to the plaintiff that induced the plaintiff to act by remaining in the defendant's employment instead of seeking other employment opportunities"); *Bouchahine v. Burning Tree Country Club, Inc.*, No. CV065004662S, 2008 WL 642697, at *4 (Conn. Super. Ct. Feb. 19, 2008) ("[T]he plaintiff has sufficiently alleged the defendant made misrepresentations to the plaintiff that induced the plaintiff to act by remaining in the defendant's employment instead of seeking other employment opportunities.").

But, when an employer makes a representation to an employee that he or she will not be terminated for a particular reason, or for a particular period of time, that can circumscribe an employer's otherwise-unfettered discretion, and give rise to a negligent misrepresentation claim if the employee is later fired. *Compare Monteiro v. Optimus Health Care*, No. CV125029748S, 2014 WL 1568604, at *3 (Conn. Super. Ct. Mar. 20, 2014) (allegation that the defendant promised employment for a definite duration of at least two years "takes the contract out of at-will employment for the first two years of the plaintiff's employment, and the plaintiff could thus have reasonably relied on such representations when they were made"), *and Ridgeway v. Royal Bank of Scotland Grp.*, No. 11 Civ. 976 (VLB), 2013 WL 1985016, at *24 (D. Conn. May 13, 2013) ("[The plaintiff's] at will employment status does not preclude him from demonstrating that he reasonably relied on representations [made by a third-party human resources company with whom the defendant contracted] in order to establish a claim for promissory estoppel or negligent misrepresentation." (citing *Stewart v. Cendant Mobility Servs. Corp.*, 267 Conn. 96 (2003)), *with Cabrera v. Am. Sch. for the Deaf*, No. HHDCV126035273S, 2013 WL 1189383, at *7 (Conn. Super. Ct. Feb. 26, 2013) (the plaintiff did not state a claim for negligent misrepresentation because "[w]ithout an allegation that the defendant would not fire her based on her criminal record, the plaintiff was simply an employee at will, and could not justifiably rely on any promise of continued employment").

Accordingly, the Court is not convinced that Corcoran's at will status alone defeats her claim of negligent representation, given the allegations that she has made in this case. However, because the Court already concluded that Corcoran failed to state a plausible claim for negligent

misrepresentation, G&E's motion is GRANTED with respect to that claim, and it is DISMISSED.[3]

**B.     Negligent Infliction of Emotional Distress**

Under Connecticut law, the following elements comprise a claim for negligent infliction of emotional distress ("NIED"): "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003).

The Supreme Court of Connecticut has explained that the range of conduct that can create an unreasonable risk of causing emotional distress in the employment context is narrow:

> We first consider the normal expectations of individuals in the context of an ongoing employment relationship. It is clear that such individuals reasonably should expect to be subject to routine employment-related conduct, including performance evaluations, both formal and informal; decisions related to such evaluations, such as those involving transfer, demotion, promotion and compensation; similar decisions based on the employer's business needs and desires, independent of the employee's performance; and disciplinary or investigatory action arising from actual or alleged employee misconduct. In addition, such individuals reasonably should expect to be subject to other vicissitudes of employment, such as workplace gossip, rivalry, personality conflicts and the like.
>
> Thus, it is clear that individuals in the workplace reasonably should

---

[3] Although G&E does not raise this argument—and, therefore, the Court will not address it in detail—the Court also concludes that Corcoran failed to allege that G&E "knew or should have known" that G&E's statement was false. *Nazami,* 280 Conn. at 262. Corcoran once again makes only one conclusory statement that is merely a recitation of the element: "G&E knew or should have known [the statement] was false." SAC ¶ 66. Corcoran's Brief provides no additional context. Pl.'s Mem at 6–7. This allegation, too, is insufficient to state a plausible claim for relief. *Cf. Lowe v. AmeriGas, Inc.*, 52 F. Supp. 2d 349, 361 (D. Conn. 1999) (concluding that an employer was entitled to summary judgment on the plaintiff's negligent misrepresentation claim because the plaintiff "produced no evidence to show that the statements, when made, were untrue or should have been known to be untrue"), *aff'd*, 208 F.3d 203 (2d Cir. 2000).

> expect to experience some level of emotional distress, even significant
> emotional distress, as a result of conduct in the workplace.  There are
> few things more central to a person's life than a job, and the mere fact
> of being demoted or denied advancement may be extremely
> distressing.  That is simply an unavoidable part of being employed.
> We recognize, however, that that does not mean that persons in the
> workplace should expect to be subject to conduct that transgress[es]
> the bounds of socially tolerable behavior; and that involves an
> unreasonable risk of causing emotional distress . . . that . . . if it were
> caused, might result in illness or bodily harm.  Nevertheless, for the
> following reasons, we conclude that, when the employment
> relationship is ongoing, the public policies enumerated in *Jaworski v.*
> *Kiernan*, [241 Conn. 399 (1997)], outweigh the interests of persons
> subject to such behavior in the workplace in being compensated for
> their emotional injuries.

*Perodeau v. City of Hartford*, 259 Conn. 729, 757–58 (2002) (citation and internal quotation marks omitted).  Accordingly, "actions or omissions occurring within the context of a continuing employment relationship, as distinguished from actions or omissions occurring in the termination of employment," generally does not satisfy the first prong of a claim for NIED.  *Id.* at 744.

Instead, a claim for NIED in the employment context "arises only where it is based upon unreasonable conduct of the defendant in the termination process."  *Parsons v. United Techs. Corp., Sikorsky Aircraft Div.*, 243 Conn. 66, 88 (1997) (citation and internal quotation marks omitted).  "The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress."  *Id.* at 88–89.  A plaintiff must allege that the "actual discharge was done in an inconsiderate, humiliating or embarrassing manner."  *Schug v. Pyne-Davidson Co.*, No. 99 Civ. 1493 (CFD), 2001 WL 34312877, at *7 (D. Conn. Dec. 10, 2001) (citation and internal quotation marks omitted).

G&E argues that the conduct during the termination process that Corcoran complains of fails to meet the requisite threshold level of severity to state a claim for NIED.  Def.'s Mem. at 8.

According to G&E, "[a]s pled, Plaintiff was simply terminated after a prior felony conviction was uncovered during a background check." *Id.* The Court agrees. Corcoran merely states that she believed that "the background check showed the felony conviction"; "[t]hereafter, on July 10, 2018, Corcoran received a letter stating that her employment with G&E was being involuntarily terminated immediately"; and that, "[her] last day of employment was July 10, 2018." SAC ¶¶ 57–59.

Corcoran's claims are similar to the plaintiff's allegations in *Mody v. General Electric Company*, No. 04 Civ. 358 (JCH), 2006 WL 413439 (D. Conn. Feb. 21, 2006), in which this Court examined whether an employer's conduct was sufficiently "inconsiderate, humiliating, or embarrassing" to support a NIED claim, albeit on a motion for summary judgment. In that case, after an employee was insubordinate in a number of ways, his employer informed him by letter that his employment was being terminated. *See id.* at *5. The plaintiff did not make any other allegations regarding his employer's conduct during the termination process, aside from sending the plaintiff the termination letter. *See id.* On that basis, the Court concluded that there was no evidence that the conduct was "inconsiderate, humiliating, or embarrassing":

> The court finds no genuine issue of material fact as to whether McDonald and the other GE supervisors and human resource managers involved in Mody's termination discharged him in a manner sufficiently "inconsiderate, humiliating, or embarrassing" to support a claim of negligent infliction of emotional distress. The court does not find any evidence that those supervisors involved in Mody's termination behaved inconsiderately or intended to embarrass or humiliate him in the course of terminating him. The Connecticut Supreme Court has held that even removing an employee from an employer's premises with a security escort does not rise to the level of unreasonable conduct, *Parsons*, 243 Conn. at 89. Here, GE terminated Mody by letter.

*Id.* at *15.

Corcoran's allegations regarding G&E's conduct are similar to *Mody*. Corcoran only alleges that G&E terminated her by letter. SAC ¶ 58. She does not allege that G&E's conduct "in the termination process" was unreasonable. *Parsons*, 243 Conn. at 88. Nor does she allege that her discharge was carried out in an "inconsiderate, humiliating or embarrassing manner." *Schug*, 2001 WL 34312877, at *7. Accordingly, Plaintiff has failed to satisfy the first prong of a claim for NIED.

Corcoran argues that G&E's conduct *before* her termination—placing her on a performance improvement plan, subjecting her to a background check, and advising her that the background check would not impact her employment—created an unreasonable risk of causing her emotional distress. Pl.'s Mem. at 9. This argument raises the question: if conduct must occur "in the termination process," at what point does that process begin? *Parsons*, 243 Conn. at 88.

Courts have rejected the argument that an employer's conduct that preceded the actual act of termination could satisfy the first prong of a claim for NIED. This Court's recent analysis in *Kleftogiannis v. Inline Plastics Corporation*, 411 F. Supp. 3d 216 (D. Conn. 2019) is illustrative. In *Kleftogiannis*, the plaintiff argued that all of the conduct beginning with his demotion and ending with his termination three months later was "part of" the termination process for purposes of a NIED claim. *Id.* at 229. In particular, the plaintiff argued that he was subjected to an extreme and outrageous "sham discriminatory investigation" that ultimately led to the termination. *Id.* However, the Court ruled that this antecedent conduct could not satisfy the first prong of a NIED claim:

> The demotion . . . was a separate employment action from the termination—even if the Court were to accept Mr. Kleftogiannis's view that they were related. As the Connecticut Supreme Court recognized, such demotions fall squarely within the category of routine employment-related conduct, as do investigations. *See Perodeau*, 259 Conn. at 757–58. In addition, numerous courts have recognized that "[e]ven if a plaintiff is terminated as a result of

> findings that that result from an investigation, the investigation itself
> is generally not part of the termination process." *Dickinson*, 431 F.
> Supp. 2d at 261 (collecting cases).

*Id.* The case at bar is similar. The employment actions that Corcoran alleges—in particular, the

performance improvement plan and the background check—all preceded, and were distinct from,

Corcoran's termination. They too cannot form the basis of Corcoran's NIED claim.

Nonetheless, Corcoran cited to a number of cases for the proposition that a court "is required

to consider the totality of the circumstances surrounding an employee's termination, rather than

limiting its review to the termination procedures alone." *Taylor v. Webster Bank, N.A.*, No.

CV116005350S, 2012 WL 3264083, at *8 (Conn. Super. Ct. July 20, 2012) (collecting cases). For

example, in *Davis v. Manchester Health Ctr., Inc.*, 88 Conn. App. 60 (2005), a nurse informed her

supervisor that a physically-challenging nursing assignment posed a health and safety risk to her

pregnancy, but the supervisor was insistent and would not reassign her despite the availability of other

jobs. *See id.* at 64. The nurse walked off the job rather than undertake the demanding assignment,

and she was terminated by phone call the following day. *See id.* Even though the manner of the

telephone call was not inappropriate, the appellate court nonetheless looked at the circumstances

surrounding the termination, and concluded that the defendant engaged in unreasonable conduct

during the plaintiff's termination:

> Forcing the plaintiff to choose between her own health and well-being
> and that of her unborn child, and her continued employment,
> especially in light of the substantial evidence of other available and
> suitable work stations, was patently unreasonable. This case is not
> one in which the defendant's employees were merely rude during the
> termination process.

*Id.* at 73.

Even if the Court looks at the context surrounding Corcoran's termination, *Davis* is distinguishable because the alleged conduct that preceded the termination was outrageous; that is, "the plaintiff reasonably believed that she would suffer physical harm if she worked on the wing on which her supervisor insisted she work." *Id.* The defendants' conduct in the other cases that Corcoran cites are similarly unreasonable.[4] In contrast, Corcoran principally alleges that she was "subject to routine employment-related conduct," such as "performance evaluations," "decisions related to such evaluations . . . and disciplinary or investigatory action arising from actual or alleged employee misconduct." *Perodeau*, 259 Conn. at 757. Although an employer's misrepresentation that a background check would not effect an employee's job is arguably outside of "routine employment-related conduct," Corcoran has not cited to any cases where such conduct was sufficiently outrageous for purposes of a NIED claim. Accordingly, Corcoran's claim for NIED is DISMISSED.

## C.     Wrongful Termination

In *Sheets v. Teddy's Frosted Foods, Incorporated*, 179 Conn. 471, 475 (1980), the Connecticut Supreme Court recognized a common law cause of action for wrongful termination "if the former employee can prove a demonstrably improper reason for dismissal, a reason whose impropriety is derived from some important violation of public policy." *Id.* at 475. Under this "public

---

[4]     For example, in one case, the plaintiff stated a claim for NIED where the plaintiff complained of sexual harassment to her supervisor that was corroborated by the local police department, but the supervisor failed to take any action and instead terminated the plaintiff while she was on a medical leave of absence for her pregnancy. *See Dichello v. Marlin Firearms Co.*, No. CV06500296S, 2007 WL 429474, at *3 (Conn. Super. Ct. Jan. 22, 2007). In another, the plaintiff stated a claim because on the day she was moving across the country to start a new job—and while the movers were at the plaintiff's house loading her belongings—the employer called the plaintiff to inform her that her employment had been terminated. *See Laros v. Int'l Insights, Inc.*, No. CV095013232S, 2011 WL 1367078, at *5–6 (Conn. Super. Ct. Mar. 17, 2011).

policy exception to the employment at will rule," a plaintiff "has the burden of pleading and proving that his dismissal occurred for a reason violating public policy." *Morris v. Hartford Courant Co.*, 200 Conn. 676, 679 (1986).

In moving to dismiss Corcoran's wrongful termination claim, G&E primarily argues that Corcoran has failed to allege that her termination violated an important public policy. Def.'s Mem. at 9. In response, Corcoran argues that the SAC sufficiently alleges that her termination violated two public policies: (1) Connecticut's "ban the box" legislation, Conn. Gen. Stat. Ann. § 31-51i ("section 31-51i")"; and (2) a U.S. Equal Employment Opportunity Commission ("EEOC") Enforcement Guidance addressing employers' consideration of criminal records. *See* Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq.*, No. 915.002, 2012 WL 1499883 (EEOC April 25, 2020) [hereinafter "Enforcement Guidance"].

### 1. *Conn. Gen. Stat. Ann. § 31-51i*

To determine whether a public policy has been violated, Connecticut courts examine whether "the plaintiff has . . . alleged that his discharge violated any explicit statutory or constitutional provision . . . [or whether] he [has] alleged that his dismissal contravened any judicially conceived notion of public policy." *Morris*, 200 Conn. at 680. The Connecticut Supreme Court has also recognized that a plaintiff may bring "a cause of action for wrongful discharge based on the public policy *embodied in*" in a particular statute. *Burnham*, 252 Conn. at 161 n.4 (emphasis added).

The Connecticut Supreme Court has analyzed whether a plaintiff's claim violated the public policy embodied in a statute on a number of occasions. In *Daley v. Aetna Life & Casualty Company*, 249 Conn. 766 (1999), for example, an at will employee claimed that her former employer terminated

her employment because she criticized her employer's failure to implement "family-friendly" workplace policies. *See id.* at 769. Specifically, the plaintiff claimed that the termination violated the important public policy that requires Connecticut employers to provide flexible work schedules for working parents, and that prohibits employers from discriminating against individuals who pursue such arrangements. *See id.* at 797. In support of that argument, the plaintiff cited to state and federal statutes that regulate workplace conduct—for example, the Connecticut Family and Medical Leave Law and the federal Family and Medical Leave Act of 1993 which provide employees with unpaid leave for the birth of a child and they proscribe retaliation for requesting such leave. *Id.* at 802. The plaintiff also cited to another state statute, intended "to balance the demands of the workplace with the needs of families," which bars employers from terminating a woman's employment because of her pregnancy or from refusing to grant a reasonable leave of absence for disability resulting from her pregnancy. *Id.* (citing Conn. Gen. Stat. Ann. § 46a-60(a)(7)). The court noted that none of the statutes "require[d] that an employer accommodate employee requests for flexible work schedules." *Id.*

In arguing that her termination violated an important public policy, the plaintiff claimed that her discharge violated the "aim of civil rights law . . . to free women from the shackles of outworn prejudices." *Id.* at 804. However, the court disagreed, and explained:

> We recognize the important public policy embodied in the express provisions of the Connecticut Family and Medical Leave Law, the federal Family and Medical Leave Act of 1993, and §§ 46a–60 (a)(7) and 17a–101 (a), and underscore every employer's duty to comply with those provisions. None of these statutes, however, expressly obligates an employer to accommodate an employee's work-at-home requests, or to refrain from taking adverse action against an employee who persists in her efforts to secure such an arrangement.

*Id.*

In *Thibodeau v. Design Group One Architects, LLC*, 260 Conn. 691, 698 (2002), the Connecticut Supreme Court addressed a similar question that lay "at the intersection of [a statute] and the public policy exception to the at-will employment doctrine." *Id.* at 694. The plaintiff in *Thibodeau* claimed that she had been wrongfully terminated after she informed her employer that she was pregnant, in violation of the public policy embedded in Connecticut's Fair Employment Practices Act. *See id.* Although the court recognized that the act prohibits discriminatory employment practices on the basis of sex—including discrimination related to pregnancy—it disagreed that the plaintiff's termination violated public policy embodied in the act. *See id.* at 702. That conclusion rested on the "significance of the statutory exemption [within the act] for employers with fewer than three employees" which "reflect[ed] a policy decision by the legislature to shield those employers from exposure to discrimination claims generally." *Id.* at 702–03. The court explained that:

> [T]he exemption contained in the act for employers with fewer than three employees is, itself, an expression of public policy that cannot be separated from the policy reflected in the act's ban on discriminatory employment practices. To conclude otherwise would require us to turn a blind eye to the legislative policy decision reflected in the statutory exemption for small employers and to the reasons underlying that decision. Although the legislative history of the act is silent as to why the legislature chose to exempt small employers from the purview of the act, the primary reason for the exemption cannot be doubted: the legislature did not wish to subject this state's smallest employers to the significant burdens, financial and otherwise, associated with the defense of employment discrimination claims.

*Id.* at 706.

In contrast to *Daley* and *Thibodeau*, the court in *Parsons* concluded that the plaintiff had a cognizable claim for wrongful termination. In that case, the plaintiff alleged that he was terminated

18

for refusing to comply with his employer's mandate to report to work at a Bahrain military base notwithstanding the United States Department of State's issuance of a travel advisory that recommended against nonessential travel to Bahrain. *See Parsons*, 243 Conn. 66 at 69–70. The plaintiff argued that "Connecticut has a general public policy requiring each employer to provide its employees with a reasonably safe workplace" by referencing several state statutes that govern workplace safety: Conn. Gen. Stat. Ann. § 31-49 which announces that it is "the duty of the master to exercise reasonable care to provide for his servant a reasonably safe place in which to work"; and Conn. Gen. Stat. Ann. § 31-370(a) which requires "[e]ach employer shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." *Id.* at 77–78. On the basis of "the language, history, and public policy" underlying the statutes, the court concluded:

> [T]his body of law expresses a clear and defined public policy requiring an employer who conducts business in Connecticut to provide a reasonably safe work place to its employees. . . . Both §§ 31–49 and 31–370 reflect a broad legislative concern for the physical welfare and safety of Connecticut employees. Consequently, we are persuaded that the mandate of public policy that these statutes embody gives a Connecticut employee a cause of action for wrongful discharge against an employer transacting business in Connecticut if the employee is discharged for refusing to work under conditions that pose a substantial risk of death, disease or serious physical harm and that are not contemplated within the scope of the employee's duties.

*Id.* at 79–80.

Notably, in rejecting the employer's argument that the statutory provisions that the plaintiff cited did not apply to employees working abroad, the *Parsons* court emphasized the breath of section 31-370's mandate to provide safe workplaces: the act "applies *to all employers, employees* and places of employment in the state" and "simply and firmly prohibit employers who conduct business in

Connecticut from exposing their employees to known hazards while they are performing their duties," regardless where their employees are located. *Id.* at 81–82 (citing Conn. Gen. Stat. Ann. § 31-369(a); internal quotation marks omitted; emphasis in original).

With this guidance in mind, the Court turns to the case at bar. As a preliminary matter, the Parties disagree about what is required to state a claim of a violation of a statute's public policy. According to G&E, if Corcoran did not allege facts to suggest that her termination violates section 31-51i, "she likewise cannot establish that her termination violates the public policy contained within that statute." Def.'s Mem. at 11. G&E asserts that "Connecticut law is clear that a plaintiff cannot rely on the public policy of [a] statute where they cannot satisfy the elements of that statute." Def.'s Reply at 6. On the other hand, Corcoran claims that "there is no obligation to plead an express violation of the elements of a statutory provision." Pl.'s Mem. at 14.

The Court agrees with G&E, and is guided by the Supreme Court of Connecticut's discussion in *Burnham*. In that case, the plaintiff claimed that her employer violated the public policy found in Conn. Gen. Stat. Ann. § 31-51m(b) ("section 31-51m(b)") which "prohibits employers from retaliating against employees who report a violation or a suspected violation of . . . law . . . to a public body." *Burnham*, 252 Conn. at 160. According to the plaintiff, she was terminated for reporting the defendants' unsafe dental practices to the Connecticut State Dental Association. *See Burnham*, 252 Conn. at 161. However, the court disagreed, and concluded that summary judgment was properly entered in favor of the defendants. *See id*. The court's ruling rested on the plaintiff's failure to satisfy one of the elements of the statute: because the plaintiff did not argue, nor was there any evidence in the record, that the dental association was a "public body" within the meaning of section 31-51m(b), the plaintiff could not rely on "the public policy embodied therein to support her claim of wrongful

discharge based on a violation of public policy." *Id*.  The court further explained:

> [T]he plaintiff did not bring a cause of action directly under §
> 31–51m, but, rather, brought a cause of action for wrongful discharge
> based on the public policy embodied in § 31–51m.  Because the
> plaintiff based her cause of action for wrongful discharge on the public
> policy embodied in § 31–51m . . . she was required to present
> evidence that created a material issue of fact with respect to whether
> the defendant' conduct violated § 31–51m.  Therefore, it was not
> improper for the trial court to consider whether the plaintiff had
> alleged that the defendants' conduct violated § 31–51m in considering
> whether the plaintiff had supported her cause of action for wrongful
> discharge based on a violation of the public policy embodied in that
> statute.

*Id.* at 161 n.4.

Although *Burnham* addressed the plaintiff's burden to defeat a motion for summary judgment,

the Court does not see why the principle would not apply with equal force in the context of a motion

to dismiss.  *See also*, *e.g.*, *Sturm v. Rocky Hill Bd. of Educ.*, No. 03 Civ. 666 (AWT), 2005 WL

733778, at *4 (D. Conn. Mar. 29, 2005) (granting motion to dismiss wrongful termination claim and

noting that the plaintiff "cites the [Individuals with Disabilities Education Act] as a potential source

of public policy, but does not allege that she is protected by the statute" (citing *Burnham*, 252 Conn.

at 182–83)); *cf. Faulkner v. United Technologies Corporation, Sikorsky Aircraft Division*, 240 Conn.

576, 582–83 (1997) (analyzing the elements of 18 U.S.C. § 1031 and concluding that the plaintiff

stated a claim for wrongful termination because "the defendant's actions appear to constitute

precisely the type of conduct that Congress intended to deter and punish by enacting the Major

Frauds Act" and because "the complaint alleged that the defendant discharged the plaintiff because

he refused to participate in violating 18 U.S.C. § 1031").  Accordingly, the Court agrees with G&E

that a plaintiff who cites to a public policy of a particular statute must plead the elements of that

statute.[5]

A case which Corcoran cites, *Schulz v. Auto World, Incoporated*, No. HHDCV156060382, 2016 WL 7135040 (Conn. Super. Ct. Oct. 25, 2016), is consistent with the Court's understanding here. Pl.'s Mem. at 14. In that case, the plaintiff was terminated two days after complaining to his employer that his supervisor was ordering guns to the workplace. *See Schulz*, 2016 WL 7135040 at *1. Corcoran cites to *Schulz* as an example of a case where the plaintiff stated a claim for wrongful termination, even though the plaintiff did not plead the elements of a statutory provision. Pl.'s Mem. at 14. However, as G&E points out, the plaintiff did allege a violation of a statutory provision, and the court assessed whether he stated a claim for relief under the statute:

> [T]he issue is whether the employee—who alleges in the complaint that he observed a significant number of firearms being delivered to his workplace that presumably did not sell or service firearms, raised to his employer his concern about the presence of a significant number of firearms in the workplace, and was thereafter allegedly discharged by his employer—has stated a recognizable claim for wrongful termination in violation of the public policy requiring an employer to provide a safe workplace under § 31–49.

*Id.* at *4.[6] Accordingly, the Court's conclusion, which is guided by the Connecticut Supreme Court's

---

[5] To be sure, the Court also agrees with Corcoran that not every wrongful termination claim requires the plaintiff to plead an express violation of the elements of a statutory provision. Pl.'s Mem. at 14. A contrary conclusion would overlook the fact that a statement of public policy may lie not only in an "explicit statutory or constitutional provision" but also in a "judicially conceived notion of public policy." *Faulkner*, 240 Conn. at 581. Rather, the Court is concluding that if a plaintiff alleges a violation of a public policy embodied in a particular statute—which is one way of pleading a wrongful termination claim—then the plaintiff must satisfy the elements of the statute. That conclusion intuitively makes sense, so a plaintiff cannot use a wrongful termination claim to attempt an end-run around a statute. *See Thibodeau*, 260 Conn. at 717 ("[T]he body of our common law, which serves to supplement the corpus of statutory enactments, is powerless to abrogate the latter, either in whole or in part." (citation and internal quotation marks omitted).

[6] To the extent *Schulz* can be interpreted otherwise, the Court agrees with G&E that it is not bound by one Connecticut Superior Court case, particularly where the Connecticut Supreme Court's

discussion in *Burnham*, remains unchanged.

The Court now turns to Corcoran's allegations in the case at bar. Corcoran claims that her termination violated the public policy set forth in section 31-51i. Pl.'s Mem. at 11. Section 31-51i bars various practices related to the disclosure of criminal records, inquiry into such records, and discrimination on the basis of those records. Plaintiff in her SAC does not attempt to plead the elements of section 31-51i, and her Brief all but concedes that she cannot do so. *Id.* at 14. There is not much case law addressing section 31-51i, but it is clear from a plain reading of the statutory text that the SAC does not state a claim for relief under any provision in the statute.

First, section 31-51i bars employers from "inquir[ing] about a prospective employee's prior arrests, criminal charges or convictions on an initial employment application." Conn. Gen. Stat. Ann. § 31-51i(b). However, the SAC does not allege that G&E inquired about Corcoran's conviction on her employment application when she first applied to work at G&E. *See generally* SAC.

Second, employers may not "require an employee or prospective employee to disclose the existence of any arrest, criminal charge or conviction," or "deny employment to a prospective employee" solely on the of a criminal record that has been "erased" under Connecticut law pursuant to Conn. Gen. Stat. Ann. §§ 46b-146, 54-76*o*, or 54-142a. Conn. Gen. Stat. Ann. § 31-51i(c), (e). Corcoran does not allege that G&E required her to disclose the existence of an *erased* criminal record—to the contrary, Corcoran alleges that the background check revealed the conviction. SAC ¶ 57.[7] Nor does Corcoran allege that as a prospective employee, she was denied employment on the

---

instruction in *Burnham* is so clear. Def.'s Reply at 5.

[7] Nor does Corcoran allege that her conviction should have been erased but was improperly disclosed to G&E. *Cf., e.g.*, *Watson v. Caruso*, 424 F. Supp. 3d 231, 245 (D. Conn. 2019) ("[The defendant's] inclusion of an erased conviction [in a background check report]—which, pursuant to

basis of her felony—rather, she claims that G&E was initially unaware of her conviction because she did not disclose it in her original employment application. *Id.*

Next, and most relevant to the case at bar, employers must not "discharge, or cause to be discharged, or in any manner discriminate against, any employee solely on the basis that the employee had, prior to being employed by such employer, an arrest, criminal charge or conviction" that has been erased. Conn. Gen. Stat. Ann. § 31-51i(f). Once again, though, that claim would fail because Corcoran does not allege that her conviction has been erased. *See generally* SAC.

Plaintiff asserts, however, that G&E "failed to offer Corcoran an opportunity to explain" her conviction prior to terminating her employment. Pl.'s Mem. at 11. The Court construes this as a claim that G&E violated section 31-51i(i), which requires, *inter alia*:

> Each consumer reporting agency that issues a consumer report that is used or is expected to be used for employment purposes and that includes in such report criminal matters of public record concerning the consumer shall:  At the time the consumer reporting agency issues such consumer report to a person other than the consumer who is the subject of the report, provide the consumer who is the subject of the consumer report notice that the consumer reporting agency is reporting criminal matters of public record, and the name and address of the person to whom such consumer report is being issued.

Conn. Gen. Stat. Ann. § 31-51i(i)(2)(A).  However, Corcoran does not allege nor argue that G&E is a "consumer reporting agency" within the meaning of the statute; and, even construing Corcoran's SAC liberally, there is no indication that G&E would satisfy the definition. *See generally* SAC.[8]

---

section 54-142e(b), ought not to have been disclosed—could very clearly have an adverse effect on an individual's employment prospects and render the report materially misleading to an employer [for purposes of a claim under the federal Fair Credit Report Act].").

[8]  A "consumer reporting agency" is defined as "any person who regularly engages, in whole or in part, in the practice of assembling or preparing consumer reports for a fee, which reports compile and report items of information on consumers that are matters of public record and are likely

Accordingly, Corcoran's pleadings would not allege a violation of section 31-51i.

Even if the Court adopted Corcoran's broader approach—that her wrongful termination claim can be premised on the public policy of a statute even though she cannot plead the elements of the statute—the Court would still conclude that the public policy in section 31-51i does not apply here.

The Court will focus on section 31-51i(f), because it fits most closely with the allegations in this case. As noted *supra*, that provision bars employers from "discharg[ing] . . . or in any manner discriminat[ing] against, any employee solely on the basis that the employee had, prior to being employed by such employer . . . [a] conviction, the records of which have been erased." Conn. Gen. Stat. Ann. § 31-51i(f). However, as the Court also noted *supra*, the statute only applies to criminal records that have been "erased." *Id.* In that regard, the statute exempts all non-erased criminal records, in much the same way that Connecticut's employment anti-discrimination statute in *Thibodeau* exempted all employers with fewer than three employees from its proscription against pregnancy discrimination. *See Thibodeau*, 260 Conn. at 706. If the Court were to conclude that the public policy embodied in section 31-51i(f) protected employees with erased *and* non-erased records—or, if it similarly ignored the exemptions found in other provisions of section 31-51i—then similar to *Thibodeau*, the Court would "turn a blind eye to the legislative policy decision reflected in the statutory exemption . . . and to the reasons underlying that decision." *Id.*

Further, the Connecticut legislature had reasons underlying its decision to only extend section 31-51i(f)'s coverage to individuals with erased criminal records. Lawmakers sought to extend the bill's coverage to explicitly delineated categories: "delinquency; family with service needs; youthful

---

to have an adverse effect on a consumer's ability to obtain employment, but does not include any public agency." Conn. Gen. Stat. Ann. § 31-51i(i)(1)(A).

offender status; criminal charges that have been dismissed, nolled, or resulted in a not guilty finding;

and absolute pardons"—nothing more.  Connecticut Bill Analysis, 2002 S.B. 456.  In other words,

the legislature did not intend to permit all individuals with criminal histories to avail themselves of the

protections of the statute, only those whose criminal records are "entitled to be erased," as

Representative Kosta Diamantis, the bill's sponsor, explained.  Connecticut House Transcript,

5/7/2002.  As Representative Diamantis clarified, this distinction was not inadvertent:

> I think it was very important to note that these particular records have
> been erased, that they don't exist.  But for some reason or another,
> and it's come about to the employer that this person at one point in
> time had a juvenile record or had a youthful offender adjudication and
> didn't acknowledge that it existed.

*Id.*

Mindful of the statute's text, legislative history, and statutory purpose, the Court cannot

conclude that section 31-51i provides Corcoran with a cause of action for wrongful termination.[9]  As

the Connecticut Supreme Court explained:

> In declining to recognize an important public policy to that effect, we
> are mindful that we should not ignore the statement of public policy
> that is represented by a relevant statute.  Nor should we impute a
> statement of public policy beyond that which is represented. To do so
> would subject the employer who maintains compliance with express
> statutory obligations to unwarranted litigation for failure to comply
> with a heretofore unrecognized public policy mandate.

---

[9]  Today, section 31-51i(f) still only protects individuals whose records have been erased
pursuant to three statutes which delineate categories of records that are subject to erasure.  *See* Conn.
Gen. Stat. Ann. § 46b-146 (addressing erased records for "any child [who]  has been convicted as
delinquent"); *id.* § 54-76o (addressing, *inter alia*, erased records of "any person has been adjudicated
a youthful offender and has subsequently been discharged from the supervision of the court"); *id.* §
54-142a (addressing, *inter alia*, erased records of individuals found not guilty of the charge or the
charge is dismissed; whose charges have been nolled or continued at the request of the prosecuting
attorney; and whose charges have been pardoned).

*Daley*, 249 Conn. at 804.

Nonetheless, Corcoran claims that the public policy set forth in section 31-51i is broader; that it embodies principles such as "the protection of individuals with a past criminal history from discrimination in the workplace"; and that "we, as a society, prefer to provide those with prior convictions an ability to re-enter the workplace and to avoid discrimination because of that conviction history." Pl.'s Mem. at 14. But that statement of the public policy is too broad. Unlike the workplace safety statutes in *Parsons*, which were "applicable wherever the master-servant relationship exists" and required employers to provide safe workplaces to "*all . . . employees* and places of employment in the state," the legislature opted to qualify the statutory text of section 31-51i in the various ways that the Court discussed *supra*. *Parsons*, 243 Conn. at 81 (citations and internal quotation marks omitted). Accordingly, Corcoran's argument regarding the breadth of the statement of public policy embodied in section 31-51i is not persuasive.

### 2.   *EEOC Enforcement Guidance*

The Court next turns to Corcoran's argument that her termination violated a statement of public policy embodied in the EEOC Enforcement Guidance.[10]

Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq*. ("Title VII") seeks to "assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973). It does so by declaring

---

[10]  The Connecticut Supreme Court has previously held that a wrongful termination claim can be premised on a federal public policy. *See Thibodeau*, 260 Conn. at 700 ("[A] wrongful discharge claim could be predicated solely on a violation of federal, as opposed to state, law." (citation omitted)). For purposes of this Ruling, the Court will assume that such a claim can be premised on a federal agency enforcement guidance.

that an employer may not, *inter alia*, "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The EEOC "has enforced Title VII since it became effective in 1965." Enforcement Guidance, 2012 WL 1499883, at *3.

Corcoran claims that her termination violated public policy because G&E failed to follow the Enforcement Guidance's recommended best practices for employers who are considering criminal record information when making employment decisions. Pl.'s Mem. at 11. According to the Enforcement Guidance, an "employer's use of an individual's criminal history in making employment decisions may, in some instances, violate the prohibition against employment discrimination." Enforcement Guidance, 2012 WL 1499883, at *2. The Enforcement Guidance also lists various "Employer Best Practices." *Id.* at *23. For example, the EEOC recommends "[d]evelop[ing] a narrowly tailored written policy and procedure for screening applicants and employees for criminal conduct." *Id.*; *see also id.* at *17 (discussing "individualized assessment" where an employer informs the individual that he may be excluded because of past criminal conduct and provides an opportunity to the individual to demonstrate that the exclusion did not apply to him). Additionally, according to the EEOC, when employers ask questions about criminal records, it is a best practice to "limit inquiries to records for which exclusion would be job related for the position in question and consistent with business necessity." *Id.* Notably, the Enforcement Guidance also recommends that employers "[e]liminate policies or practices that exclude people from employment based on any criminal record." *Id.* at 22.

Notwithstanding these broad proclamations, the Court is not convinced that Corcoran's

termination violated a statement of public policy embedded in the Enforcement Guidance. That is principally because, as the Enforcement Guidance notes and as G&E points out, although Title VII prohibits employment discrimination based on race, color, religion, sex, or national origin, "[h]aving a criminal record is not listed as a protected basis in Title VII." *Id.* at \*6. Therefore, "whether a covered employer's reliance on a criminal record to deny employment violates Title VII depends on whether it is part of a claim of employment discrimination based on race, color, religion, sex, or national origin." *Id.*

In the case at bar, Corcoran does not allege that she was discriminated against on the basis of any of those protected classes. *See* Doc. 39, at 1–2 (withdrawing discrimination claims).[11] She asserts in essence that she was discriminated against on the basis of her criminal record. However, the Enforcement Guidance explicitly states that such a claim "is not listed as a protected basis in Title VII," which in and of itself is a statement of public policy that the Court must recognize. Enforcement Guidance, 2012 WL 1499883, at \*6. Corcoran's assertion is therefore untenable in light of the case law discussed *supra*. *See, e.g., Daley*, 249 Conn at 804 (declining to find statement of public policy in connection with a claim of employment discrimination because "[n]one of these statutes . . . expressly obligates an employer to . . . refrain from taking adverse action against an

---

[11] If Corcoran were still alleging that she was discriminated against on the basis of a protected class, then the Court agrees with G&E that she would be precluded from bringing a wrongful termination claim because she would have an adequate statutory remedy. *See, e.g., Conge v. Sikorsky Aircraft Corp.*, No. 05 Civ. 1650 (PCD), 2007 WL 4365676, at \*10 (D. Conn. Dec. 11, 2007) ("[The plaintiff] also claims that Defendant wrongfully terminated his employment in violation of . . . Title VII. Because he has pleaded a violation of numerous statutes that provide adequate remedies in these circumstances, Connecticut law forecloses his common law wrongful discharge claim." (citation omitted)); *Blantin v. Paragon Decision Res., Inc.*, No. 03 Civ. 2162 (CFD), 2004 WL 1964508, at \*2 (D. Conn. Aug. 31, 2004) ("Since [plaintiff] has remedies available to her under Title VII . . . she may not bring a common-law wrongful discharge action based on a violation of the public policy embodied in Title VII.").

employee who persists in her efforts to secure such an arrangement"); *Thibodeau*, 260 Conn. at 706 ("[T]he exemption contained in the act . . . is, itself, an expression of public policy that cannot be separated from the policy reflected in the act's ban on discriminatory employment practices.").

Accordingly, Corcoran has failed to identify an "important and clearly articulated public policy," and her wrongful termination claim must be DISMISSED. *Thibodeau*, 260 Conn. at 701.

### C.       Breach of the Duty of Good Faith and Fair Dealing

In Connecticut, "[e]very contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Gupta v. New Britain Gen. Hosp.*, 239 Conn. 574, 598 (1996) (citation and internal quotation marks omitted). To state a claim of breach of the implied covenant of good faith and fair dealing, a plaintiff must allege: "(1) that there was a contract between the plaintiff and the defendant; (2) that the defendant acted in such a way to impede or interfere with the plaintiff's right to receive benefits that she reasonably expected to receive under the express terms of the contract; and (3) that such acts of impeding or interference by the defendant with the plaintiff's right to receive benefits reasonably expected under the contract were taken in bad faith." *Weissman v. Koskoff*, No. HHDCV106012922S, 2011 WL 590461, at *4 (Conn. Super. Ct. Jan. 19, 2011), *aff'd sub nom. Weissman v. Koskoff, Koskoff & Bieder, P.C.*, 136 Conn. App. 557 (2012).

The Connecticut Supreme Court has recognized that the implied covenant of good faith and fair dealing applies to employment contracts, but that it should not "be applied to transform a contract of employment terminable at the will of either party into one terminable only at the will of the employee or for just cause." *Magnan v. Anaconda Indus., Inc.*, 193 Conn. 558, 568–69 (1984). Thus, the court has narrowed a plaintiff's ability to bring a claim for a breach of the doctrine in the

employment context in a number of significant ways.

First, a plaintiff must allege that the termination occurred under circumstances where the reason for an employer's discharge "involves impropriety . . . derived from some important violation of public policy." *Id.* at 569 (citation omitted). Second, a plaintiff must not possess an alternative remedy to vindicate his or her claim. *See Burnham*, 252 Conn. at 159–60 ("The cases which have established a tort or contract remedy for employees discharged for reasons violative of public policy have relied upon the fact that in the context of their case the employee was otherwise without remedy and that permitting the discharge to go unredressed would leave a valuable social policy to go unvindicated." (citation and internal quotation marks omitted)).

The Court has already concluded that Corcoran has failed to identify an important and clearly articulated public policy that G&E violated. *See supra* Section III.C. Accordingly, because a plaintiff must allege a violation of public policy in order to state a claim for a breach of the implied covenant of good faith and fair dealing, Corcoran's claim is DISMISSED. *See Alterio v. Almost Family, Inc.*, No. 18 Civ. 374 (VAB), 2019 WL 7037789, at *10 (D. Conn. Dec. 20, 2019) ("[The plaintiff] merely repeats her earlier claim that [the defendant] violated an implied covenant of good faith and fair dealing. Because, as discussed above, the Court again dismisses her public policy violation claim, the Court must again dismiss her implied covenant of good faith and fair dealing claim."); *Grossman v. Computer Curriculum Corp.*, 131 F. Supp. 2d 299, 307 (D. Conn. 2000) ("As the court has determined above that the defendant's alleged actions do not contravene some important public policy [for purposes of a wrongful termination claim], the plaintiff's claim of breach of an implied covenant of good faith and fair dealing must fail.").

31

## IV.   **CONCLUSION**

For the reasons discussed herein, G&E's motion to dismiss [Doc. 44] is GRANTED.

Plaintiff's SAC is DISMISSED.  The Clerk is directed to close the file.

It is SO ORDERED.

Dated: New Haven, Connecticut
   September 4, 2020

          */s/ Charles S. Haight, Jr.*
          CHARLES S. HAIGHT, JR.
          Senior U.S. District Judge